**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

| | | |
|---|---|---|
| **MICHAEL BORDER and DONNA BORDER,** | ) | |
| Plaintiffs, | ) | **Case No.: 3:25-CV-632-CWB** |
| **v.** | ) | |
| **STATE FARM FIRE AND CASUALTY COMPANY,** | ) | |
| Defendant. | ) | |

# PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Donna Border ("Mrs. Border") respectfully submits the following Brief in Opposition to the Motion for Summary Judgment filed by Defendant State Farm Fire and Casualty Company ("State Farm"). For the reasons that follow, this Court should deny State Farm's Motion in its entirety.

## INTRODUCTION AND BACKGROUND

On August 18, 2024, a storm blew a large tree on Mrs. Border's[1] residence causing substantial damage and rendering it uninhabitable. The residence was insured by State Farm's renewal homeowner's policy form HW-2101. The damages constituted a covered loss under the policy, and Mrs. Border complied with all conditions of the policy.

State Farm's agent, Karen Channell ("Channell"), sold the Policy to Mrs. Border. After State Farm was placed on notice of Mrs. Border's claim, Channell referred Tony Bishop,

[1] Mrs. Border's husband, Michael Border, has died since the filing of this action. Mrs. Border filed a Suggestion of Death on March 15, 2023 (Doc. 30) and has not moved to substitute Mr. Border's estate. Accordingly, this action is being prosecuted on Mrs. Border's behalf only. References to acquisition of the Policy and related matters, even when they involved Mr. Border, will refer to Mrs. Border only.

("Bishop"), a licensed general contractor, to Mrs. Border to repair her residence. Bishop ultimately became the contractor who made the partial repairs.

State Farm assigned Shane Abernathy ("Abernathy") to adjust Mrs. Border's claim. However, Channell substantially interjected herself in the claims process, met and worked with Abernathy, and became an additional claims handler for State Farm. Channell's actions served to create an apparent agency relationship between Channell and State Farm, and likewise, created an apparent agency relationship between Bishop and State Farm.

Bishop met with Abernathy at Mrs. Border's residence in August 2024. During the meeting, Bishop advised Abernathy that the house was not square and had been "racked." As a result, the scope of damages and repairs could not be assessed without substantial demolition.

After being advised that the scope could not be determined absent demolition work, and before the demolition began, Abernathy began preparing an Xactimate estimate containing detailed scope. Abernathy prepared the Xactimate estimate for the sole purpose of establishing the amount of insurance proceeds that would be paid by State Farm under "Coverage A– Dwelling" of the Policy. However, the Policy specifically limits State Farm's use of inspections and reports ("estimates") to circumstances that relate to insurability or policy premiums. Thus, State Farm's use of the Xactimate estimate violated the terms of the Policy.

State Farm based its first dwelling coverage payment under the Policy solely off the estimate prepared by Abernathy. The estimate did not and could not have stated the actual scope of the damages to the residence. The payment made by State Farm pursuant to the estimate was entirely inadequate and was exhausted by Bishop's demolition and repairs by January 8, 2025.

In January 2025, Bishop advised Abernathy of the inadequacy of the payment and that he would have to cease work on Mrs. Border's residence because she was out of money. At that time,

State Farm failed or refused to pay any further "Section A–Dwelling" insurance proceeds in excess of the amount of the estimate prepared by Abernathy despite its woefully inadequate scope.

In February 2025, Channell requested Bishop prepare an estimate of the cost to repair Mrs. Border's residence and provide a copy to Abernathy. Bishop prepared a written estimate and emailed it to Abernathy on February 19, 2025. Bishop estimated the remaining cost to repair the residence to be $118,174.80 plus the previous insurance benefits paid to Mrs. Border. State Farm is now estopped from objecting to the form of the estimate as it was prepared at its request and through its apparent agent. State Farm, however, failed to consider Bishop's estimate or request that Bishop provide any explanation about it.

State Farm's failure to consider or act upon the estimate resulted in Bishop leaving the jobsite when Mrs. Border could no longer pay the cost of repairs. When Bishop left, the home was in a state of disrepair and subjected to nature's elements.

Mrs. Border's home remained in this condition for months. Over this time, and despite being requested to at least pay the roof cost to avoid the dwelling incurring further damage, State Farm failed or refused to tender additional "Coverage A- Dwelling" benefits until April 10, 2025. But even when State Farm tendered additional proceeds, they represented a fraction of Bishop's estimated cost of repairs.

Additionally, State Farm only paid a portion of the loss of use benefits available to Mrs. Border under the Policy. State Farm has failed to consider or pay any of the additional living expenses ("ALE") due Mrs. Border under Section C of the Policy. Moreover, in direct violation of the provisions of the Policy that it drafted, State Farm ceased making the partial loss of use benefits it was paying as of July 2025.

Now, more than two years after the loss, Mrs. Border's home remains unrepaired and uninhabitable. And because State Farm, acting in bad faith, has breached its obligations due under the Policy, and has not paid or tendered any form of benefits under the Policy since April 2025, Mrs. Border has lost her ability to recover further benefits under the Policy.

## NARRATIVE STATEMENT OF FACTS

### I. The Policy

On or about July 19, 2024, State Farm issued Mrs. Border renewal form HW-2101 homeowner's policy number 01–GN–6655–3 (the "Policy"). (Ex. D.) The Policy provided insurance for the dwelling located at 9589 Pearson Chapel Rd., Goodwater, AL (the "residence" or "dwelling") and provides the following limits of coverage[2]:

| | |
|---|---|
| **A. Dwelling** | **$277,100** |
| **Other structures** | **$27,710** |
| **B. Personal property** | **$207,825** |
| **C. Loss of use** | **$83,130** |

(*Id.* at S.F. 1291.)

The Policy term was from July 19, 2024, until July 19, 2025. (*Id.*) Mrs. Border's residence suffered substantial damages constituting a covered loss on September 18, 2024, and was rendered uninhabitable. (Ex. D; S.F. 02-19). The Declaration Page, Policy and any endorsements to the Policy govern Mrs. Border's relationship with State Farm. (Ex. O, Abernathy Depo. at pp. 26–27, 76-78.)

The following provisions of the Policy are material to the issues presented in this case:

**ADDITIONAL MESSAGES[3]**

[…]

---

[2] Additional coverages are provided under the Policy and will be further addressed herein.

[3] These "Messages" are found on the Declarations Page.

Your policy consists of these Declaration, the Homeowners Policy shown above, and any other forms or endorsements that apply[.]

(Ex. D, S.F. 1291.)

[…]

**SECTION I – PROPERTY COVERAGES**

**COVERAGE A – DWELLING**

1. **Dwelling. We** cover the **dwelling** and materials and supplies located on or adjacent to the **residence premises** for use in the construction, alteration, or repair of the **dwelling** or other structures on the **residence premises**.

(*Id.* at S.F. 1306.)

[…]

**COVERAGE C – LOSS OF USE**

The most ***we*** will pay for the sum of all losses combined under **Additional Living Expense**, **Fair Rental Value**, and **Prohibited Use** is the limit of liability shown in the ***Declarations*** for **Coverage C – Loss of Use**.

> 1. **Additional Living expenses.** When a **loss insured** causes the **residence premises** to become uninhabitable, **we** will pay the reasonable and necessary increase in cost incurred by an **insured** to maintain their normal standard of living for up to 24 months. **Our** payment is limited to incurred costs for the shortest of:
>
> > A. **the time required to repair or replace the premises;**
> >
> > B. the time required for **your** household to settle elsewhere;
> >
> > C. 24 months"

(*Id.* at S.F. 1309) (emphasis added).

[…]

**SECTION I – CONDITIONS**

2. **Your Duties After Loss**. After a loss to which this insurance may apply, **you** must cooperate with **us** in the investigation of the claim and also see that the following duties are performed:

[…]

d. as often as **we** reasonably require:

(1) exhibit the damaged property;

(2) provide **us** with any requested records and documents and allow **us** to make copies;

[…]

e. submit to **us** within 60 days following the loss **your** signed sworn proof of loss that sets forth, to the best of **your** knowledge and belief:

[…]

(5) specification of any damaged structure and detailed estimates for repair of the damage.

(*Id.* at S.F. 1321.)

**SECTION I AND SECTION II – CONDITIONS**

12. **Right to Inspect.**

a. **We** have the right but not obligation to perform the following:

(1) make inspections and surveys of the **insured location** at any time,

(2) provide **you** with reports on conditions **we** find, or

(3) recommend changes.
<u>**Any inspections, surveys, reports or recommendations relate only to insurability and the premiums to be charged**</u>.

(*Id.* at S.F. 1332.) (emphasis added).

When the loss occurred, Mr. Border was suffering from advanced stage dementia, which required Mrs. Border to deal with the State Farm agent and adjuster concerning the claim. It is undisputed that Mrs. Border complied with all obligations under the Policy, and that coverage

under the Policy was "never in dispute."[4] (Ex. U, Stokes Depo at p. 44: 2-4; Ex. O, Abernathy Depo, at pp. 59-62.)

## II. <u>The Operation Guide and the Structural Policy</u>.

State Farm has adopted numerous policies and procedures identified as "Operation Guide(s)" (the "O.G."), which provide detailed interpretations of various provisions of the Policy and govern or provide guidelines for State Farm claim handlers. (Ex. B.) State Farm has also published a document entitled "Structural Damage Claim Policy" (the "Structural Policy"), which State Farm generates with every Xactimate estimate prepared by its adjusters. State Farm uses the Xactimate program for the preparation of its estimates for all casualty claims. (Ex. B; O.G. 75-07, § F; Ex. U, Stokes Depo. pp. 30-31). In its Motion, State Farm relies heavily on the Structural Policy; however, the Structural Policy purports to place extracontractual obligations on State Farm insureds while in no manner binding them. (Ex. O, Abernathy Depo. at pp. 26-27:15-21.)

Substantively, the Structural Policy conflicts with the terms of the Policy. The Policy limits State Farm's use of any inspection or report to matters that relate to ***insurability and premiums only***. (Ex. C, S.F. 1332.) The Structural Policy purports to place obligations on State Farm's insureds to contact State Farm if their adjuster's estimate is higher than State Farm's. (*Id.*) Clearly, State Farm is attempting to control the insured's "contractor of choice" by measuring the insured's contractor's estimate against its own Xactimate estimate. (*Id.*) These actions violate the terms of

[4] The Policy expired on July 19, 2025, and auto renewed for the period of July 19, 2025, to July 19, 2026. (Ex. A, 114). Mrs. Border did not submit a new application, and the premium was billed to her mortgage holder. (*Id.*; Ex. U, Stokes Depo. at pp. 45-46.) When State Farm renewed the Policy, the home had not been repaired and remained uninhabitable. (Ex. U, Stokes Depo. at pp. 51: 11-23 and 99:14-20; Ex. O, Abernathy Depo. at pp. 156-157.) Despite its condition, State Farm *increased* the coverage under the renewal policy for Section A-Dwelling from $277,100.00 to $288,800.00, "Section B - Personal Property" from $207,825.00 to $216,600.00, and "Coverage C - Loss of Use" from $83,130.00 to $86,640.00. State Farm also raised the premium from $1,270.00 to $1,399.00. (Ex. A, 111-116.)

the Policy yet remarkably are consistent with State Farm's policies and procedures. (Ex. B; O.G. 75-07, § F.)

The O.G. further provides, "This document provides policyholders with information to assist them with their estimated building repairs including contractor selection." (*Id.*) Finally, the O.G. also prohibits claim handlers from recommending a specific contractor to an insured and states that the insured is to select "the contractor of their choice to perform the repairs." (Ex. B at § (F)(1)). However, the referral of Bishop by a State Farm claims handler is exactly what occurred in the adjustment of Mrs. Border's claim. (Ex. T, Bishop Depo. at pp. 145-149.)

## III. <u>The Claim and Involvement of Karen Channell</u>.

Mrs. Border's daughter reported the claim to Channell on the date of the loss, and shortly thereafter, Channell referred Bishop. (Ex. T, Bishop Depo., at pp. 145-149.) Channell's referral of Bishop violated provisions of State Farm's O.G. 75-07. (Ex. "B"). Channell also deeply involved herself in Mrs. Border's claim process. (Ex. S, Channell Depo. at pp. 49-52, 61-74, and 94-99; Ex. T, Bishop Depo. at pp. 98-112; and Ex. O, Abernathy Depo. at pp. 154-57 and 190.) Channell's referral of Bishop substantially affected Mrs. Border's options concerning her claim. The referral caused Mrs. Border to lose her ability to participate in the "SFPFP Contractor Service Program." (Ex. B, O.G. 71-44 at § IV.) Instead of having the ability to select from a group of general contractors acceptable to State Farm, who prepare their own estimates and warrant the repairs made in writing for five (5) years, Channell referred a general contractor handling his first insurance job. (Ex. B; Ex. T, Bishop Depo. at p. 50:13-15.)

Channell has attempted to distance herself from Bishop and the referral she made to Mrs. Border. (Ex. S, Channell Depo. at pp. 49-52.) However, Bishop testified that Channell called him and "asked—wanted me to go look at it, asked me if I—if I wanted to do the job." (Ex. T, Bishop

Depo. at pp. 99-101.) The personal nature of Bishop's relationship with Channell is further revealed in text messages between Channell and Bishop. (Ex. E.) The texts reveal Channell and Bishop discussing a social barbeque and whether Bishop had any alcoholic beverages available for consumption. Additionally, Bishop was working on Channell's lake house at the time of the referral. (*Id.*; Ex. S, Channell Depo. at pp. 95-99.)

Mrs. Border, who is a 72-year-old widow and has maintained homeowner's insurance with State Farm through Channell's agency since at least 2005, verbally allowed Bishop to repair her home based on her long-term affiliation with Channell. (Ex. S, Channell Depo at pp. 25-26, 28-29; Ex. R, Border Depo at pp. 28-31.) Mrs. Border testified, "I felt like since State Farm sent him [Bishop] that they was doing everything." (Ex. R, Border Depo. at p. 31:4-9.)

Mrs. Border's daughter reported the loss on the date of the loss to Channell. The following information was ultimately provided to State Farm:

> **heavy wind storm, tree fell on across the house, roof damage, water pouring into the home damaging the living room and laundry room, water damage to walls, ceiling and the floor**

(Ex. F, S.F. 02.)

State Farm used this information to set reserves for the "Section A–Dwelling" coverage at $11,750.00. (*Id.*, S.F. 20).[5] This reveals State Farm's undervaluation of Mrs. Border's claim from the very beginning.

## IV. Abernathy's Inspection(s) and Preparation of the First Xactimate Estimate.

On August 29, 2024, 11 days after State Farm's receipt of the notice of loss, Abernathy conducted an initial inspection at the dwelling. (Ex. H, S.F. 39.) The inspection was not for the purpose of creating an inspection report relating to insurability or premiums, which are the only

[5] Interestingly, it was not until Mrs. Border filed a Motion to Compel that State Farm produced an unredacted copy with an identical Bates label number. (Ex. F, S.F. 20(R) and 20.)

reasons the Policy provides for conducting such an inspection. Instead, Abernathy performed the inspection to prepare an Xactimate estimate to dictate what State Farm would pay under the dwelling coverage of the Policy. (Ex. O, Abernathy Depo. at pp. 64-66; and Ex. G.) Mrs. Border was present and exhibited the damaged property to Abernathy as required by the Policy. (Ex. H, S.F. 39.) However, Bishop was not present at Abernathy's initial inspection. (*Id.*)

Abernathy conducted a follow-up on-site inspection on September 18, 2024, when Bishop and Mrs. Border were present. (Ex. H, S.F. 36.) During this inspection, Bishop explicitly told Abernathy that the required scope of repairs could not be established until substantial demolition was completed. Bishop explained that the house had been "racked," was no longer "square," and required demolition to reveal hidden damage. (*Id.* at S.F. 35; Ex. T, Bishop Depo. at pp. 10-15.) Because the scope of the repairs could not be determined, Bishop and Abernathy did not discuss scope during the meeting of September 18, 2024. In fact, the two never discussed scope. (Ex. T, Bishop Depo. at p. 135:9-12.)

The meeting concluded with Bishop advising Abernathy that the starting cost of repairs would be $60,000 to $70,000. (Ex. T, Bishop Depo. at pp. 75-77.) Bishop had over 30 years of experience in construction prior to being licensed as a general contractor, and he immediately recognized that the home had been "racked." (*Id.* at pp. 77-79.)[6] Since the home was no longer "square," the walls, including the exterior walls, had to be removed. (*Id.* at pp.78:7-23 and 79: 5-9). Bishop explained this to Abernathy. (*Id.* at pp. 77-78.) Despite the terms of the Policy and Bishop's clear explanation, Abernathy nevertheless began preparing an Xactimate estimate containing an alleged scope of damages/repairs that were impossible to determine at the time. (Ex. G; Ex. O, Abernathy Depo. at pp. 117-121). As a result, the scope of repairs could not have been

[6] When Channell referred Bishop to Mrs. Border, he had held a general contractor's license for less than five years. (Ex. T, Bishop Depo. at p.62:6-13.)

accurate because demolition on the dwelling had not begun. Ex. G, First Est.; Ex. O, Abernathy Depo. at pp. 84, 110, and 234.) The scope set forth in the estimate of October 2024 excluded substantial necessary repairs. (Ex. T, Bishop Depo. at pp. 41-43.) Abernathy's own diary notes discuss needed repairs (i.e., scope) not included in the estimate. (Ex. H, S.F. 35-36.)

Critically, Abernathy lacked the education and building experience to even evaluate or prepare an Xactimate estimate to determine scope, actual cash value ("ACV"), or replacement cost value ("RCV") benefits.[7] (Ex. O, Abernathy Depo. at pp. 32-33.) The only person with the requisite knowledge and expertise to evaluate scope or cost of repair was Bishop. (Ex. S, Channell Depo at pp. 66-67.) Chanell testified that she considers Bishop a competent contractor and would believe him under oath. (Ex. S, Channell Depo. at pp. 73-74.) Concerning Abernathy's qualifications (or lack thereof), State Farm's O.G. 75-07 § II A (3)(a) lists State Farm's first recommended requirement for an adjuster to prepare an Xactimate estimate to be the adjuster's completion of building and construction training. (Ex. B, S.F. 21-31.) Abernathy has no such training, and neither does his direct supervisor, Jason Stokes ("Stokes") (Ex. U, Stokes Depo. at pp. 22-26.) Stokes serves as Abernathy's claim manager and is responsible for developing Abernathy's estimating skills. (Ex. B, O.G. 75-07 at § II A94.) However, Stokes testified at his deposition that he did not know the extent of Abernathy's training. (Ex. U, Stokes Depo. at pp. 27-28.) Abernathy testified to his complete lack of education, training, and experience in the field of construction. (Ex. O, Abernathy Depo. at pp. 32-33 and 102-103.)

Abernathy prepared an Xactimate estimate on October 10, 2024. Abernathy did so despite his lack of qualifications and without any inability to ascertain the appropriate scope of repairs. These deficiencies resulted in the estimate being grossly inadequate; however, State Farm relied

[7] RCV benefits represent the "replacement cost value" due under the Policy upon the insured actually making the repairs and meeting other conditions of the Policy.

exclusively on the estimate in tendering all payments made pursuant to "Coverage A – Dwelling" made to Mrs. Border prior to April 10, 2025. (Ex. O, Abernathy Depo. at pp. 32-33, 63-66, and 102-103; Ex. G.) On October 14, 2024, State Farm tendered its unilaterally determined ACV payment of $56,495.97. (Ex. I, S.F. 021.) Bishop used these funds for demolition and repairs; however, the funds were exhausted by January 7, 2025.

Since Abernathy lacked the requisite training and skill to perform the estimate in the first place and had also been advised by Bishop that scope was undeterminable due to the damage, State Farm was aware that the estimate did not accurately establish the benefits due Mrs. Border under "Coverage A–Dwelling." However, State Farm was undeniably aware of the inadequacy of the estimate as of November 26, 2024. On that date, Abernathy met Bishop, Mrs. Border, and her son-in-law for a follow-up inspection at the dwelling. Mrs. Border exhibited the damaged property and the work performed by Bishop to date. (Ex. H, S.F. 33.) Upon viewing the residence, Abernathy objected that the work exceeded the scope set forth in State Farm's estimate. (*Id.*; Ex. T, Bishop Depo. at pp. 131-144.) However, the scope described in State Farm's October 2024 estimate was not governing Bishop's work as scope was not discussed. Abernathy specifically complained of the removal of the kitchen cabinetry and Bishop's "gutting" the kitchen. However, when memorializing the meeting in his diary notes, Abernathy acknowledged Bishop's explanation that the cabinets and other work were necessary due to water damages and damaged roof trusses. (*Id.* at pp. 23-30 and 135; Ex. H, S.F. 33-34.)

## V. __Abernathy's Inconsistencies and Misrepresentations in his Adjustment the Claim__.

Abernathy's diary note of January 8, 2025, states that Abernathy advised Bishop that he needed "information … regarding replacement of the cabinetry." (Ex. H, S.F. 31.) Bishop has no recollection of this request. (Ex. T, Bishop Depo. at pp. 24-25.) Regardless, Abernathy had

already received the information prior to the diary entry. Specifically, Abernathy sent a text message to Mrs. Border on December 18, 2024 (18 days prior to the diary entry), advising her that he had received the cabinet estimate. (Ex. J, 106.)

Additional false entries appear throughout Abernathy's diary. One such example is in an entry dated March 27, 2025, when Abernathy reported that on January 7, 2025, "the contractor [Bishop] confirmed the progress of repairs was proceeding on schedule and was "in budget." (Ex. H, S.F. Bates 28) (emphasis added). However, a review of Abernathy's January 7, 2025, diary note reveals that no mention of the project being in budget was made by Bishop. (Ex. H, S.F. 31; Ex. T, Bishop Depo. at pp. 162-163.) Abernathy references the "in budget" statement allegedly made by Bishop in a number of his diary notes. (Ex. H.) Abernathy's notes also refer to his updating the ALE worksheets. However, a review of the ALE worksheets reveal no such updates. Instead, the worksheets overwhelmingly constitute mirror images of one another, fail to reflect the consideration of numerous compensable ALE items, and reference only State Farm's payment of Mrs. Border's monthly rent of $1,200. (*Id.*; Ex. K.)

Perhaps the most blatant misrepresentations made by Abernathy occurred under cross examination by State Farm's attorney during Abernathy's deposition. Under examination by Mrs. Border's counsel, Abernathy testified concerning his failure to respond to numerous text messages from Mrs. Border. (Ex. O, Abernathy Depo at pp. 66-73.) These texts are dated February 7, 2025; February 17, 2025; March 18, 2025; April 1, 2025; April 2, 2025; April 9, 2025; and April 10, 2025. (Ex. J.) However, when State Farm's counsel attempted to rehabilitate him, Abernathy testified concerning his failure to respond as follows:

> **Q.** All right. Even if there's not a text from you back to her responding to her text, did you also respond to her texts by telephone calls and/or personal visits?
>
> **A.** Yes, sir.

**Q.** And are those reflected in your activity notes?

**A.** Yes, sir.

**Q.** So if we looked at the date of a text that Mrs. Border sent to you and then we looked at the activity notes after that date, we would see how you may have responded to Mrs. Border?

**A.** There would be a corresponding...

**Q.** A corresponding what?

**A.** Note.

**Q.** Note. Do you remember any texts that you just ghosted her, ignored her, just completely ignored her and didn't give her a response to what her inquiry was?

**A.** I don't recall not—ignoring her or ghosting her at any time.

(Ex. O, Abernathy Depo. at p. 196:2-23.)

A review of Abernathy's activity notes, save and except his note of April 10, 2025, reveal **NO** notations of Abernathy responding to any of Mrs. Border's texts. (Ex. H, S.F. 26-30.) Mrs. Border's handwritten notes of Abernathy's repeated failure to respond to her texts corroborate Abernathy's failure to respond. (Ex. J-1.) Abernathy did exactly what he testified under oath that he did not—he "ghosted" Mrs. Border.[8] (Ex. L and Ex. J-1.) Abernathy ignored State Farm's insured in direct violation of State Farm's policies and procedures. (Ex. B, O.G. 75-5 § IV.)

In January 2025, Mrs. Border and Bishop advised Abernathy that Mrs. Border had no further money to make repairs. Instead, of working with Bishop to determine ACV required to repair the residence, State Farm elected to pay the remaining amounts under the October 2024 estimate, representing RCV. (Ex. O, Abernathy Depo at pp. 139-140; Ex. I, S.F. 21.) State Farm

---

[8] State Farm's factual allegations at Paragraph 181 of its Motion for Summary Judgment rely on Abernathy's testimony contained at page 196 as quoted above. However, Abernathy's notes simply do not support his testimony. At a minimum, Abernathy's testimony was misstated and, at worst, it constitutes perjury.

paid this amount on January 9, 2025, in the amount of $14,138.65. (*Id.*) State Farm tendered no additional "Coverage A–Dwelling" benefits to Mrs. Border until April 10, 2025. (*Id.*)

In the April 10, 2025, "activity note," Abernathy acknowledged that Mrs. Border advised him that the previous supplemental payment of $14,138.65 was not enough to complete the repairs to her home. Abernathy further misstated that Bishop advised the Border project was "in budget" as recently as January 7, 2025. Finally, Abernathy referred to speaking with Channell and her agreement with the Border claim-handling and further stated that State Farm's estimate will update scope of repairs. (Ex. H, S.F. 26-30.)

## VI. Bishop Prepares an Estimate at Channell's Request/Abernathy Prepares a Second Xactimate Estimate.

In February 2025, Channell contacted Bishop and requested that he prepare an estimate of the cost to complete the repairs to Mrs. Border's home. (Ex. T, Bishop Depo at pp. 81-82, 99, 112.) Channell requested the estimate in an attempt to prevent the claim from being referred to "corporate," provided Bishop two days to prepare it, and requested that Bishop send it to Abernathy. (*Id.*)

On February 8, 2025, Bishop emailed Abernathy all invoices previously billed on the Border job and on February 19, 2025, emailed him his estimate. (Ex. M; Ex. N.) The estimate accurately described cost of repairs when it was prepared; however, because of additional damage suffered to the home since Bishop prepared the estimate, the cost of the necessary repairs are due to be redetermined. (Ex. T, Bishop Depo at p. 110.)

Bishop's estimate of February 2025 estimated the cost to complete the repairs at $118,174.80, plus the benefits previously paid by State Farm. (Ex. N.) When Bishop emailed the estimate to State Farm, he wrote:

> **We look forward to finding a satisfactory solution that will finish the project, have everyone paid properly, and have the client back home safely as soon as possible.**

(Ex. M.)

Bishop received no reply to his email, and no one with State Farm asked him any questions about his estimate. (Ex. T, Bishop Depo. at p. 152:1-23.) Instead of working with Bishop and addressing the estimate he provided, Abernathy engaged in the preparation of a second Xactimate estimate on March 27, 2025. (Ex. P.) This estimated resulted in an additional "Coverage A–Dwelling" payment in the sum of $49,079.40 made to Mrs. Border on April 10, 2025. (*Id.*; Ex. P-1.) State Farm's total "Coverage A–Dwelling" payments tendered to date equal $135,014.34. (Ex. F, S.F. 21.) This sum is $64,646.12 less than the full price of Bishop's estimated repair cost as of February 18, 2025. (*Id.*; Ex. N.) However, because State Farm allowed the dwelling to languish unrepaired and exposed to the elements for months, the estimated costs of repair have since increased. (Ex. T, Bishop Depo at pp. 154-155.)

State Farm tendered the $49,079.70 as the final settlement proceeds for "Section A–Dwelling" coverage. (Ex. H; Ex. O, Abernathy Depo. at p. 171; Ex. P-1.) When State Farm tendered that amount, it knew the proceeds were inadequate; and it also knew that Mrs. Border's house was without a roof, exposed to the elements, and uninhabitable. (Ex. T, Bishop Depo. at pp. 175-179.)

## VII. <u>Loss of Use/Additional Living Expenses Benefits</u>.

The Policy provides Loss of Use coverage in the amount of $83,130.00. (Ex. D at 1293.) Upon the dwelling being rendered uninhabitable by a covered loss, these provisions provided for Loss of Use/Additional Living Expenses ("ALE") benefits up to this amount. (*Id.*) O.G. 75-02, at § II, describes that loss of use coverage for ALE are designed to indemnify the insured for the

reasonable amounts of money necessarily spent above their normal expenditures in order that the insured may maintain a standard of living when the residence premises is rendered uninhabitable. (Ex. B, O.G. 75-102.)

On August 29, 2024, Abernathy determined that Mrs. Border's dwelling was unhabitable, and she became entitled to all Loss of Use/ALE benefits under the Policy. (Ex. B, S.F. 39; Ex. C, S.F. 1309.) O.G. 75-102 provides a non-exclusive list of ALE considerations that should be discussed with the insured. Increased cost of meals, transportation, cost associated with living expenses (e.g., laundry, dry cleaning, garbage disposal, etc.) are to be considered when making the ALE calculations for increased or reduced expenses. (Ex. B, O.G. 75-102, § V(A)). Abernathy failed to discuss the availability of all Loss of Use/ALE benefits available to Mrs. Border and further failed to consider or pay the same. (Ex. H; Ex. K.)

On June 13, 2025, despite knowledge that its final settlement tendered under "Coverage A–Dwelling" was inadequate and that Mrs. Border's home remained uninhabitable with no roof, State Farm also terminated the partial loss of use/ALE benefits previously being made effective as of July 15, 2025. (Ex. H, S.F. 25.) State Farm did so on the authority of Stokes because repairs on the dwelling were no longer ongoing. (Ex. O, Abernathy Depo, at p. 164; Ex. U, Stokes Depo. at pp. 57-73, 76, and 234). However, State Farm refused to resume loss of use payments even after being advised that Bishop intended to resume repairs in approximately one week. (Ex. U, Stokes at pp. 234-235.)

State Farm's cessation of the partial loss of use payments to Mrs. Border violates the explicit provisions of its own Policy. (*Id.*; Ex. D at § C- Loss of Use (1)(A)). State Farm's pattern and practice is to cease loss of use/ALE payments if repairs on a damaged dwelling are not ongoing. (Ex. U, Stokes Depo. at pp. 57-73, 76, and 234). Stokes provided detailed testimony

that this was State Farm's practice and acknowledged that the Policy did not contain a provision authorizing State Farm to stop the payments based on cessation of work. (*Id.*)

Prior to the termination, the loss of use/ALE payments being made by State Farm were insufficiently limited to payment for Mrs. Border's monthly rental costs in the amount of $1,200.00. State Farm did not comply, or even attempt to comply, with its loss of use/ALE obligations under the Policy. (Ex. U, Stokes Depo. at pp. 67-76; Ex. K.)

O.G. 75-102, §§ II(B)-(K) and V deal with State Farm's obligations to pay ALE under Form HW-2101 policies. (Ex. B, 76-88). Section V requires State Farm to compute ALE taking into consideration the insured's normal expenses, reduced expenses, and any increased expenses. (*Id.* at 83.) State Farm failed to consider Mrs. Border's increased living expenses entirely. (Ex. K.) Exhibit K constitutes all ALE worksheets prepared by Abernathy. (*Id.*) None of the worksheets reflect any consideration or calculations of Mrs. Border's ALE costs. (*Id.*) In his deposition, Stokes agreed that if O.G. 75-102 applied to Mrs. Border's claim—and it does—failure to apply it would be an error. (Ex. U, Stokes Depo. at pp. 373-374.) In fact, failure to apply or follow the O.G. constitutes a violation of the Policy. (*Id.* at p. 374:4-14.)

O.G. 75–102, § V (A)(2)-(5) of provides examples of ALE expenses that State Farm must consider. Abernathy refers to the payment of ALE and his completion of ALE worksheets in multiple claim diary entries. (Ex. H.) However, a review of the ALE worksheets reveals that Mrs. Border's utility, meal, transportation, and miscellaneous expenses were never considered or calculated. (Ex. K, S.F. 440-465). The ALE worksheets purport to represent consideration of Mrs. Border's meal expenses; however, the calculations are identical from week to week and do not result in any ALE payments. (*Id.*) All remaining ALE considerations are blank. (*Id.*)

In its Motion, State Farm contends that the ALE was "suspended," not terminated. (Doc. 45, ¶ 45.) However, Stokes' deposition was taken one day following the 24-month anniversary of the Policy. The Policy provides that State Farm's payment of loss of use/ALE benefits is for the shortest of "the time required to repair or replace the premises (dwelling) or … 24 months." (Ex. D, 1309.) Stokes opined that Mrs. Border is no longer eligible for loss of use/ALE due to the lapse of time. (*Id.*, Ex. U, Stokes Depo. at pp. 362-364.) Of course, this lapse of time was ***caused*** by State Farm.

Furthermore, at or about the time State Farm terminated its payments for loss of use/ALE benefits, Mrs. Border's son-in-law advised State Farm that Bishop would be resuming repairs in approximately one week. (Ex. U, Stokes Depo. at pp. 230-233.) Bishop did exactly that; he used approximately $12,000 of funds borrowed by Mrs. Border to install a permanent roof on the dwelling. (Ex. T, Bishop Depo at pp. 46-57.) The dwelling remained uninhabitable, and even then, State Farm refused to reinstate the partial loss of use benefits previously paid to Mrs. Border, and after March 25, 2025, never visited the residence again. (Ex. U, Stokes Depo at p. 360.)

## VIII. Additional Provisions of the Policy Breached by State Farm.

State Farm breached other Policy provisions in addition to those described above. State Farm contends it paid the cost of temporary repairs required by the Policy. It did not. The ***only*** reference to temporary repairs contained in State Farm's production appears in State Farm's second estimate and are listed under "Total Temporary Repairs." (Ex. P, S.F. 733). The temporary repairs do not concern the temporary roof repairs as represented by State Farm. They concern the monthly cost of temporary toilet facilities at the worksite. (*Id.*) State Farm has not considered or paid Mrs. Border for her temporary repairs to the roof of the dwelling pursuant to her obligations to protect the dwelling from further loss. (Ex. T, Bishop Depo. at pp. 138-140.)

Mrs. Border also purchased "Endorsement OL," which provides additional coverage for "ordinance/law- 10%." (Ex. D, S.F. 1291.) O.G. 75-107, § VI requires the claim handler to communicate the option or coverage to the insured and document the claim file accordingly. (Ex. H.) The dwelling was required to be rebuilt to the updated code(s), and State Farm did not consider this cost. (Ex. T, Bishop Depo. at p.124.) State Farm's claim diary makes no mention of this optional coverage purchased by Mrs. Border.

## IX. **Final Attempts at Resolution.**

Mrs. Border ultimately retained legal counsel in a futile attempt to persuade State Farm to comply with its Policy obligations.[9] On June 25, 2025, counsel notified State Farm of his representation via email. State Farm responded by email on July 2, 2025, wherein it referenced and declined a demand that was never made by Mrs. Border in the amount of $238,143.24. (Ex. Q, S.F. Bates 380-391.) In its email response of July 2, 2025, State Farm also quoted language contained in the Structural Policy. (*Id.*) State Farm referred to the language as "policy provisions" and quoted portions of the Structural Policy purporting to require Mrs. Border to contact State Farm before repairs were begun if her contractor's estimate was higher than State Farm's.

The quoted language further referenced State Farm's commitment to "work with" the insured and her contractor to recover the actual and necessary cost of covered repairs. (*Id.*) However, State Farm did not "work with" Mrs. Border, and the language in the Structural Policy conflicts with the terms of the Policy itself. (Ex. C; Ex. D; Ex. T, Bishop Depo at pp. 129-130.) Incredibly, the language does not even apply to the relationship between State Farm and Mrs. Border. (*Id.* at pp. 41-51.)

[9] The counsel Mrs. Border initially retained was not the undersigned.

## X. Present Condition of Dwelling

Due to the acts of State Farm as described herein, Mrs. Border's dwelling remains uninhabitable. (Ex. V, Photos.) Mrs. Border has not received any of the remaining $68,718.99 Loss of Use benefits available to her. She also remains displaced from her home.

## STANDARD OF REVIEW

When a district court reviews a motion for summary judgment, it must determine two things: (1) whether any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to judgment as a matter of law. *Cole v. Owners Ins. Co.*, 326 F. Supp. 3d 1307, 1313–14 (N.D. Ala. 2018) (citing Fed. R. Civ. P. 56(c)). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed. R. Civ. P. 56). The moving party can meet this burden by offering evidence showing no dispute of material fact or by showing that the non-moving party's evidence fails to prove an essential element of its case on which it bears the ultimate burden of proof. *Id.* at 322-23, 106 S.Ct. 2548.

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). In reviewing the evidence submitted, the court must "view the evidence presented through the prism of the substantive evidentiary burden," to determine whether the nonmoving party presented sufficient evidence on which a jury could reasonably find

for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Cottle v. Storer Commc'n, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Furthermore, all evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999).

## ARGUMENT AND AUTHORITY

### I. All of State Farm's Arguments Fall Flat.

State Farm's reasoning and arguments miss the mark all but entirely. This is partly because the argument is premised on a number of factual allegations that are at best mischaracterized or false. In the interest of brevity, Mrs. Border will not belabor the Court with every instance; however, Mrs. Border is compelled to point out some of the most glaring.

- At paragraph 15, State Farm claims an insured can "request" access to the SFPSP program if the insured does not have a contractor. No supporting citation is provided. Actually, State Farm's policies and procedures dictate that the adjuster advise the insured of the program. The insured is not to be advised if they already have a "contractor of their choice." State Farm chose Bishop, not Mrs. Border.
- At paragraph 41, State Farm alleges that Channell does not get involved in the adjustment process. However, she became entangled in the process by sending Bishop to Mrs. Border, discussing cost of repairs with Bishop, requesting an estimate of the remaining cost of repairs from Bishop and that it be sent to Abernathy, requesting the estimate to avoid the claim being referred to corporate, and meeting with Abernathy to discuss the claim process
- At paragraphs 110-112, State Farm claims Bishop may not have provided documents to Abernathy supporting replacement of the kitchen cabinetry as asserted by State Farm.

However, on a date prior to the dates referenced in these paragraphs, Abernathy acknowledged receiving the cabinet estimates from Mrs. Border. He then represented in his claims diary notes that he had not received them.

- At paragraph 114, State Farm alleges that Bishop stated the project was "in budget." The statement is alleged to have been made on January 7, 2025, but it does not appear in Abernathy's note of January 7, 2025.
- At paragraphs 123-125, State Farm refers to the insured's duty to provide requested records and that State Farm never received the detailed estimate requested from Bishop (not Mrs. Border). Mrs. Border filed a sworn proof of loss that State Farm unconditionally accepted, and State Farm never requested that she produce additional records. The duty is on the insured, not Bishop. Also, Channell requested the estimate from Bishop, not Abernathy, and Bishop did provide a detailed estimate as well as all his invoices. State Farm, not Mrs. Border, failed to define detailed estimates in the Policy. The term is certainly open to more than one reasonable interpretation.
- At paragraph 151, State Farm alleges a relative of Mrs. Border's was advised that ALE payments would continue as long as repairs were in progress. State Farm never paid all benefits due under ALE as reflected in the ALE worksheets and did not reinstate the partial ALE payments that were being made when repairs began anew on the dwelling in July 2025.
- At paragraph 152, State Farm refers to a time to repair having been agreed upon. No evidence is offered or exist establishing any such agreement because no agreement was ever made.

- At paragraph 157, State Farm alleges that it responded to Border's attorneys and rejected the demand. Actually, State Farm had previously replied to the attorney and declined a demand stated to be for the sum of $238,143.24 that was never tendered.
- At paragraph 180, State Farm contends that the claim is not closed. This directly contradicts State Farm's corporate representative's testimony that benefits (ALE) are no longer available under the Policy as more than two years have elapsed since the date of loss. State Farm repeatedly relies on the Structural Policy. It does not govern the parties' relationship, contains conflicting provisions, and conflicts with the Policy.
- Paragraph 181 is addressed in detail in Mrs. Border's narrative statement of facts concerning Abernathy's lack of a response to Mrs. Border's texts. The statements made in paragraph 181 are simply not true.

All in all, State Farm takes great liberties with the facts in its argument. But the argument itself is fatally flawed because State Farm limits its focus on the issue of Bishop's alleged failure to provide a detailed estimate. Initially, State Farm accepted Mrs. Border's proof of loss, acted on it, agreed that coverage was never in issue and failed to request a "detailed estimate" from the insured. Furthermore, the term is not defined in the Policy and is ambiguous. The ambiguity of the term may be ***a point***, but it is not ***the point***. Furthermore, the estimate State Farm complains about was prepared and produced by State Farm's limited agent, Bishop.

Next, State Farm argues that ALE has not been terminated. This is in direct conflict with State Farm's corporate representative's testimony that ALE benefits are no longer available under the Policy due to lapse of time. State Farm also denied ALE benefits by failing to advise Mrs. Border of all benefits due and failing to pay the same.

As has been the case since the day after a tree fell through Mrs. Border's roof, it is clear that State Farm and Mrs. Border are not even close to being on the same page. Nonetheless, even though some of the issues below were not directly raised by State Farm in its Motion, Border will attempt to address the true matters at issue before the Court to present a correct basis for her claims and their legal viability.

## II. **Mrs. Border complied with all terms and conditions of the Policy, and State Farm breached numerous provisions.**

Based on the undisputed material facts, State Farm breached the terms of its Policy with Mrs. Border—so much so that Mrs. Border would be entitled to Judgment as a Matter of Law on the claim at trial. As such, not only does Mrs. Border's claim for breach of contract survive, but her bad faith claim does as well.

In Alabama, a contract of insurance, like other contracts, is governed by the general rules of contracts. *Twin City Fire Ins. Co. v. Alfa Mut. Ins. Co.*, 817 So. 2d 687, 691 (Ala. 2001) (citing *Pate v. Rollison Logging Equip., Inc.*, 628 So. 2d 337 (Ala. 1993)). The material elements necessary to establish a cause of action for breach of contract under Alabama law are: "(1) a valid contracting binding the parties; (2) the plaintiff's performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages." *Reynolds Metal Co. v. Hill*, 825 So. 2d 100, 105-06 (Ala. 2002) (citing *State Farm Fire & Cas. Co. v. Slade*, 747 So. 2d 293, 303 (Ala. 1999)). Insurance contracts, like other contracts, are construed so as to give effect to the intention of the parties, and, to determine this intent, a court must examine more than an isolated sentence or term; it must read each phrase in the context of all other provisions." *Twin City Fire Ins. Co.*, 817 So. 2d at 691 (quoting *Attorneys Mut. of Ala., Inc. v. Smith, Blocker & Lowther, P.C.*, 703 So. 2d 866, 870 (Ala. 1996)). However, "[u]nder Alabama law, when doubt exists as to whether coverage under an insurance policy is provided, language used by the insurer must be construed

for the benefit of the insured." *Norman v. State Farm Fire & Cas. Co.*, No. 2:22-CV-367-SMD, 2023 WL 5020253, at *5 (M.D. Ala. Aug. 7, 2023) (quoting *Assoc. Scrap Metal, Inc. v. Royal Globe Ins. Co.*, 927 F. Supp. 432, 437 (S.D. Ala. 1995)). "[E]xceptions to insurance coverage are to be interpreted as narrowly as possible in order to provide maximum coverage for the insured, and such clauses must be construed most strongly against the company that issued the policy." *Norman*, 2023 WL 5020253, at *5 (quoting *Assoc. Scrap Metal, Inc.*, 927 F. Supp. at 437) (further citations omitted).

In this case, State Farm argues that it did not breach the insurance contract because it performed under the Policy and the Borders did not. State Farm is mistaken.

**A. Mrs. Border's Compliance**

Mrs. Border did not breach any conditions of the Policy. State Farm has acknowledged this, and a brief review of the facts quickly dispel State Farm's belated claims to the contrary. Mrs. Border's duties following a covered loss are not complicated; they are governed by Section I – Conditions ¶ 2(a)-(e) of the Policy. Mrs. Border complied with each provision. She cooperated, gave immediate notice of the loss, protected the property, exhibited the damaged property as requested, and timely submitted a sworn proof of loss, which State Farm unconditionally accepted.

**B. Channell and Bishop's Agency**

Outside of the sworn proof of loss, State Farm did not request Mrs. Border to provide any records or documents. The Policy obligations fall on Mrs. Border, not the contractor referred to her in violation of State Farm's policies and procedures. Six months after Sate Farm requested Mrs. Border's proof of loss and Channell sent Bishop to her home, Channell requested Bishop to prepare an estimate of the cost to complete the repairs. She afforded Bishop two days to complete the task.

Channell's insertion into the claims-handling process converted her an apparent agent and, by extension, converted Bishop into State Farm's apparent agent as well. Channell began her apparent agent authority on behalf of State Farm when she sent Bishop to Border and advised Bishop to go to Mrs. Border's house if he wanted the job. Border reasonably and in good faith was led to believe from the apparent authority of Channell that an agency relationship existed between State Farm and Channell. Mrs. Border acted under a good faith belief to her prejudice and therefore, State Farm is estopped from denying the agency. *See Bain v. Colbert Cty. Northwest Ala. Health Care Authority*, 233 So. 3d 945, 956 (Ala. 2017) (discussing the concept of apparent agency or agency by estoppel). More importantly, under Alabama law, "agency is generally a fact question to be determined by the trier of fact." *Malmberg v. American Honda Motor Co.*, 644 So. 2d 888, 891 (Ala. 1994).

Likewise, Channell, acting as an apparent agent of State Farm, created an agency relationship on between State Farm and Bishop—at a minimum, as to the form of the estimate he was given two days to prepare. State Farm policies and procedures acknowledge a "partnership" between State Farm claims and its captive agents such as Channell. The primary object of that "partnership" is to assure all claims are promptly reported and handled in accordance with the policy contract. (Ex. K at O.G. 75-01 II(B)).

Bishop's preparation of the estimate was clearly within the line and scope of his limited agency with State Farm. In fact, it was exactly what he was requested to do. State Farm attempts to distance itself from Bishop, claiming that Channell "did nothing more than give him Ms. Border's name and number and told him that she would be calling him to see if he could help her." This, of course, directly contradicts the sworn testimony of Mrs. Border and Bishop. State Farm also attempts to use the Structural Policy in claiming that Bishop worked for Mrs. Border and not

State Farm. However, the Structural Policy is not a part of the Policy and is not binding on Mrs. Border and conflicts with the Policy terms. State Farm's attempt to use the Structural Policy is immaterial but is indicative is the disingenuous presentation of the issues before the Court.[10] State Farm cannot impose extracontractual obligations on its insured in a document that accompanies a State Farm estimate prepared for purposes not permitted by the Policy.

**C. Policy Ambiguities**

State Farm complains that Bishop's estimate does not constitute a "detailed estimate" referenced at ¶ 2(e)(5) of the Policy. State Farm also contends that the term is not ambiguous and should be afforded its "common everyday meaning." This Court has held that "[t]he terms of an insurance policy are ambiguous only if the policy's provisions are reasonably susceptible to two or more constructions or there is reasonable doubt or confusion as to the meaning of the terms." *Norman*, 2023 WL 5020253, at *5 (quoting *State Farm Fire & Casualty Co. v. Slade*, 747 So.2d 293, 308 (Ala. 1999)

Here, State Farm certainly could have defined the term when it drafted the Policy but elected not to. Instead, State Farm created an ambiguity in the Policy that is required to be construed in a light most favorable to Mrs. Border. *Id.* (citation omitted). Regardless, the estimate was not Mrs. Border', not was not requested from Mrs. Border, and was produced after State Farm accepted the sworn proof of loss. State Farm is now estopped from attacking the format of the estimate due to its agency relationship with Bishop. State Farm also waived its challenges when it unconditionally accepted Mrs. Border's sworn proof of loss, acknowledged coverage under the policy, and conceded that coverage was never an issue. Furthermore, while State Farm's payments

[10] State Farm's claim that "the Structural Damage Claim Policy references an estimate from the insured's contractor (as required by the conditions of the policy)" is simply not true. The Policy has no such requirement.

were inadequate and violative of a number of Policy provisions, they were still made in reliance on the proof of loss. State Farm accepted the proof of loss, recognized coverage, made partial payments under the policy, and has now waived the issue asserted. *See Coastal Life Ins. Co. v. Malone*, 114 So. 2d 277 (Ala. 1959) (holding that where an insurance company "performs some act which constitutes a recognition of its liability under the policy, as where the company attempts to settle or adjust the claim, or pays or offers to pay part or all of the loss under the policy, any defects or irregularities in the notice or proofs of loss are waived thereby.")

**D. State Farm's Breaches**

State Farm argues that it performed while Mrs. Border did not. In so arguing, State Farm ignores its numerous breaches of the Policy. State Farm agreed to provide the insurance provided in the Policy, which contains all the agreements between the parties. State Farm provided insurance coverage for the damages to the dwelling up to the limits set forth in the declarations page, including the cost of temporary repairs made by Mrs. Border to the dwelling, Loss of Use/ ALE benefits, and benefits under "Endorsement OL" for increased cost of repairs caused by the enforcement of building ordinances.

**1. Improper Creation and Use of the Xactimate Estimates**

State Farm breached its obligations when it used the Xactimate estimates for an improper purpose. Abernathy prepared the first Xactimate and second Xactimate estimates for the prohibited purpose of State Farm establishing the ACV due Mrs. Border. The Policy does not allow inspections or estimates to be used for this purpose.[11] The Policy provision entitled "Right to Inspect" is applicable to property and liability coverage. The provision specifically limits State

[11] It is not Mrs. Border's position that State Farm cannot prepare an Xactimate at all, but it cannot be used to dictate the benefits to be paid under the Policy.

Farm's use of any inspections, surveys, reports (i.e., *estimates*), or recommendations as they relate ***only to "insurability and the premiums to be charged***."

Here, State Farm used the Xactimate estimates to establish the ACV that it would pay to Mrs. Border, giving her no option on a "take it or leave it" basis. While this is in accord with State Farm's policies and procedures, it is in blatant violation of the actual Policy governing the relationship. Both Xactimate estimates were produced with the Structural Policy, which contradicts the terms of the Policy. For example, State Farm attempts to impose extracontractual obligations on Mrs. Border to seek permission from State Farm to begin repairs if "her contractor's estimate is higher than State Farm's." Yet State Farm simultaneously claims, in the very same document, that Mrs. Border is the only one who can authorize when repairs begin and includes a self-serving statement that the contractor works for the insured, not State Farm.

State Farm's use of the Xactimate estimates to determine ACV was exacerbated by the fact that it was prepared by an unqualified adjuster who omitted material portions of the scope of damages despite being instructed to the contrary by the general contractor responsible for the work. State Farm used the estimate to tender its initial and grossly inadequate ACV payment on October 14, 2024.

**2. Loss of Use/ALE**

State Farm further breached its obligations under the "Coverage C – Loss of Use." The provisions, as well as State Farm's Policies and Procedures interpreting the provisions, provide that the coverage is designed to allow the insured to maintain their standard of living when their dwelling is rendered uninhabitable.

It is undisputed that the damages to the dwelling were a covered loss and rendered the dwelling uninhabitable (even to date). Because the dwelling was rendered uninhabitable, Loss of

Use/ALE benefits became due under the Policy for the shortest of (a) the time required to repair or repair the dwelling or (b) 24 months. State Farm was obligated to pay ACV to repair or replace damaged portions of the dwelling up to the amounts stated on the declaration page. Because it failed miserably in this regard, the dwelling remains uninhabitable. Contrary to State Farm's position that it has loss of use benefits to Mrs. Border, it has not. Loss of Use/ALE is not limited to the payment of rent. State Farm's policies and procedures, as well as the Policy itself, provide for much broader coverage than State Farm tendered or explained, including but not limited to meals, transportation, and other living expenses such as dry cleaning and garbage disposal. Abernathy failed to disclose the full nature of the ALE coverages to Mrs. Border, and the ALE worksheets reflect that these benefits were never even considered or paid.

Even more egregious, State Farm cut off the paltry ALE benefits it was paying. State Farm attempts to justify this by claiming that repairs must be ongoing for an insured to be eligible for such payments. However, this requirement is nowhere to be found in the Policy, which State Farm has acknowledged. State Farm's alleged reason for terminating ALE is manufactured. But even if that were the case (and it is not), State Farm overlooks several critical facts: (1) State Farm paid ALE benefits for four months while no work was performed; (2) Stokes testified that the benefits would restart if work did; (3) Bishop resumed repairs in July 2025, and State Farm was advised in advance that he would; (4) State Farm has not set foot on Mrs. Border's property since March 25, 2025 and, therefore, never checked to see whether work was ongoing or not; (5) the dwelling was (and is) uninhabitable; and (6) perhaps most importantly, ***State Farm was responsible for the work stoppage in the first place.***[12]

---

[12] State Farm also claims that Mrs. Border did not use the $49,079.90 paid in April 2025 towards repairs and "gave it to their lawyer instead." This position ignores several realities. First, the payment was submitted in a form representative of a final payment. Had Mrs. Border accepted the check, State Farm would have certainly treated Mrs. Border depositing the check as either acceptance, waiver, or an accord

**3. Temporary Repairs**

State Farm further breached the provisions of the Policy set forth under Section I – Coverages ¶ (2) entitled "Temporary Repairs." State Farm, relying on Abernathy's testimony at page 202 of his deposition, represents that it "paid for the tarp which had been put on the house but failed." This "fact," however, is based on more false testimony of Abernathy. The only "Temporary Repair" mentioned in more than 1,580 pages of documents produced by State Farm references potential payment for toilet services at the Border project. Payment for temporary roofing, placement of temporary roofing, or payment for a tarp by State Farm does not appear in ***any*** payment records or the Xactimate estimates supporting the payments made by State Farm. Abernathy appears to have fabricated this testimony.

In reality, and as Bishop confirmed in his deposition, he or the Borders made or attempted to make temporary repairs to the roof. The repairs failed resulting in additional damages to the dwelling. Abernathy was informed, but refused to pay the cost to repair the roof and the resulting damages followed. State Farm argues that the cost to repair the roof are contained in the October 2024 estimate. However, the premature and wholly incomplete description of the required scope contained therein required the funds designated for repairs to be used to repair items not contained in the Xactimate estimate. In any event, State Farm did not pay the cost of these temporary repairs, their records do not support Abernathy's contentions, and State Farm breached the subject provisions of the Policy.

---

and satisfaction. Second, it is undisputed that the amount tendered was insufficient to complete repairs, so accepting the check would have only delayed the inevitable. Indeed, State Farm's claim that "had supplemental payments after the payment of $49,079.90 been warranted or justified, repairs would have continued until completion and additional living expenses would have continued" **is not supported by a single piece of evidence** (documentary or testimony) before the Court.

**4. "Endorsement OL"**

Finally, State Farm breached the provision of the Policy when it failed to consider, much less pay, any benefits pursuant to "Endorsement OL," which is designed to add a premium in order to update the repairs to conform with existing codes and regulations. Bishop testified that the dwelling was required to be rebuilt to the updated code(s), and State Farm did not consider this cost in the improper Xactimate or when tendering the ACV or RCV amounts to Mrs. Border.

**E. Legal Authority**

While the undersigned have not been able to find a case containing a factual analog, the case of *Cole v. Owners Insurance Co.*, 326 F.Supp.3d 1307 (N.D. Ala. 2018) is nevertheless instructive. In that case, the plaintiffs' home was severely damaged in a fire. Plaintiffs filed a claim with their insurer for: (1) dwelling payments; (2) contents payments; (3) debris removal expenses; and (4) ALE expenses. *Id.* at 1314. The carrier determined that the dwelling claim was worth $46,551.71 RCV and paid the plaintiffs an ACV amount of $33,006.20 but did not make a payment for personal property. Thereafter, Plaintiffs hired their own third-party consultant to evaluate the dwelling damage, prepare a contents inventory list, and to assess the value of the claim. *Id.*

The plaintiffs, by and through their third-party consultant, and the carrier then began a lengthy disagreement over the value of the dwelling claim, the plaintiffs' personal property claim, whether and how to engage in the appraisal process, and whether plaintiffs had properly submitted a proof of loss form. *Id.* at 1315-1318. During this process, the plaintiffs' home was uninhabitable, so they moved into another home that they owned but typically rented. *Id.* at 1318. Plaintiffs ultimately added a claim for ALE. More than one year after the fire, and after requiring plaintiffs to submit to examinations under oath, the carrier sent a letter to plaintiffs' attorney stating the

amounts claimed on the proof of loss form "may be incorrect" and that the carrier was "unable to accept the amounts presented as accurate with the information we know at this time. *Id.* The carrier offered no explanation as to what it doubted concerning the accuracy of the claim, nor did it provide any further steps to investigate the claim.

Both plaintiffs and the insurer filed cross motions for summary judgment. The Court granted plaintiffs' motion for summary judgment on the breach of contract claim. The Court held that plaintiffs had complied with each requirement under the Policy, which the Court noted (just as in this case) were a duty to submit a proof of loss and exhibit the property. *Id.* at 1321-24.

The Court also denied the carrier's motion for summary judgment on bad faith, rejecting the insurer's arguments that it did not breach the policy because plaintiffs failed to meet conditions precedent under the policy, and that it had a legitimate or arguable reason not to pay. The Court held that the carrier breached the contract by failing to engage in the appraisal process to settle the value of the claims and further held that "[g]enuine issues of material facts exist as to the other elements of bad faith, *i.e.*, whether Owners intentionally denied the claim, whether it had a legitimate or arguable reason to deny the claim, and whether it had actual knowledge of the lack of a legitimate or arguable reason to deny the claim." *Id.* at 1330. Specifically, the Court noted that "a reasonable jury could infer from the facts of this case that Owners engaged in a pattern of behavior to delay paying the claim and avoid making a good-faith investigation of it, including submitting to appraisal, a process that would have resulted in a final determination on the value of the claim." *Id.*

The facts of this case are similar. Mrs. Border suffered a loss, and she complied with every condition of the policy relative to her obligations thereafter. Although Bishop and Abernathy may have disagreed (just as the plaintiffs and carrier in *Cole*), as set forth extensively above, there exists

a question of fact whether State Farm "engaged in a pattern of behavior" to avoid paying Mrs. Border's claim and making a good faith investigation. Stokes' testimony and State Farm's policies and procedures (particularly those contained and described in Exhibits B and U) certainly tend to establish that State Farm's actions in this matter evidence not only a pattern and practice but also appear to be a design to engage in similar claims-handling behavior to that involved in this case.

As such, State Farm is not entitled to summary judgment as to Mrs. Border's claim for breach of contract. If anything, the opposite is true. Based on the undisputed material facts, Mrs. Border has presented substantial evidence of multiple breaches of the Policy by State Farm. This claim should proceed to trial.

## III. <u>State Farm committed Bad Faith concerning Mrs. Border's benefits under "Coverage A – Dwelling</u>."

State Farm committed bad faith when it denied Mrs. Border's claim for benefits under "Coverage A – Dwelling" without an arguable reason for doing so. "Under Alabama law, there are two types of bad faith insurance claims: (1) "normal" bad faith, or "bad faith refusal to pay," and (2) 'abnormal' bad faith, or 'bad faith failure to investigate.'" [13] *Norman v. State Farm Fire & Cas. Co.*, No. 2:22-CV-367-SMD, 2023 WL 5020253, at *8 (M.D. Ala. Aug. 7, 2023) (citing *Cole v. Owners Ins. Co.*, 326 F. Supp. 3d 1307, 1329 (N.D. Ala. 2018); *White v. State Farm Fire & Cas. Co.*, 953 So. 2d 340, 349 (Ala. 2006)). The tort of bad faith has four elements plus a conditional fifth element:

(1) an insurance contract between the parties that the insurer breached;

[13] Under the *Erie* doctrine, a federal court exercising diversity jurisdiction must apply the substantive law of the state where it sits, including its choice of law rules. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, (1938) (finding that a federal court sitting in diversity must apply the substantive law of the state in which it sits). To determine state substantive law, the federal court follows the rulings of the state's highest court, in this case the Alabama Supreme Court. *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018). When the state's highest court has not decided an issue, the federal court "must predict how the highest court would decide th[e] case." *Id.*

> (2) an intentional refusal to pay the insured's claim;
>
> (3) the absence of any reasonably legitimate or arguable reason for that refusal (*i.e.*, the lack of a debatable reason);
>
> (4) the insurer's actual knowledge of the lack of any legitimate or arguable reason for denying the claim; and
>
> (5) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.

*Norman*, 2023 WL 5020253, at *8 (quoting *State Farm Fire & Cas. Co. v. Brechbill*, 144 So. 3d 248, 257 (Ala. 2013) (quoting, in turn, *Nat'l Sec. Fire & Cas. Co. v. Bowen*, 417 So. 2d 179, 183 (Ala. 1982))). "To succeed on a 'normal' bad faith claim, a plaintiff must prove the first four elements." *Norman*, 2023 WL 5020253, at *8 (quoting *Garber v. Nationwide Mut. Ins. Co.*, 2021 WL 5811733, at *9 (N.D. Ala. Dec. 7, 2021)). To succeed on an "abnormal" bad faith claim, a plaintiff must prove all five. *Norman*, 2023 WL 5020253, at *8 (quoting *Garber*, 2021 WL 5811733, at *9). In this case, Mrs. Border has presented substantial evidence of her claims for bad faith under "normal" and "abnormal" theories.[14]

**A. State Farm Denied the Claim for Benefits under "Coverage A – Dwelling."**

State Farm initially contends that it did not deny Mrs. Border's claim for additional benefits under "Coverage A – Dwelling," claiming it only "requested additional information." State Farm contends there was no denial, and thus, no bad faith. State Farm's argument is belied by *Cobblestone Condo. Ass'n, Inc. v. Travelers Cas. Ins. Co. of Am.*, 377 F. Supp. 3d 1291, 1307 (N.D. Ala. 2019). In that case, the Court held that the insurer's providing a partial payment but

---

[14] In its Motion, State Farm contends that Mrs. Border did not plead "abnormal" bad faith. However, the Alabama Supreme Court has held that "here is only *one* tort of bad-faith refusal to pay a claim, not two "types" of bad faith or two separate torts. *State Farm Fire & Cas. Co. v. Brechbill*, 144 So. 3d 248, 257–58 (Ala. 2013). Therefore, pleading a cause of action for bad faith encompasses either theory (or both).

choosing not to pay any additional benefits based on its insistence that the plaintiff did not satisfy its post-loss obligations was tantamount to a denial. *Id.* The Court held that the insurer's "decision not to satisfy the claim or to move a resolution forward via appraisal amounted to a denial of the claim." *Id.* The Court acknowledged that "the Alabama Supreme Court has recognized that a delay in payment may constitute a denial of a claim even though the insurer has agreed to pay some amount toward the claim." *Id.* (citing *Livingston v. Auto Owners Ins. Co.*, 582 So. 2d 1038, 1041-42 (Ala. 1991) (finding that insurer's "investigative tactics" and delay in paying the claim "amounted to a denial of the claim").

State Farm denied Mrs. Border's claim. The fact that State Farm now claims otherwise is beyond the pale. State Farm has tendered payments to Mrs. Border for the claim yet has not paid a dime more since April 10, 2025. State Farm stalled the claim process by paying the remaining RCV stated in the improperly prepared and used Xactimate estimate of October 2024. State Farm tendered RCV on January 9, 2025. However, State Farm did not conduct any investigation of the true cost to repair Mrs. Border's residence and failed to consider the Bishop's February 2025 estimate. It was not until March 27, 2025, that State Farm began preparing the second Xactimate estimate and on April 10, 2025, it tendered a second inadequate payment. During these 91 days, the home sat exposed to the elements and incurred additional damages that have yet to be paid for. State Farm's portrayal that it stood ready to pay more money upon the receipt of a detailed estimate from Bishop strains credulity and is directly contradicted by the written record and sworn testimony of Bishop himself. The 18-month delay (or, more appropriately, termination) between the last ALE payment to date by State Farm is tantamount to a denial of the claim. *See Cobblestone*, 377 F. Supp. 3d at 1307. Moreover, State Farm's dilatory tactics resulted in no further payments under the Policy and are now barred due to 24 months having now elapsed.

### B. The Xactimate Estimates Cannot Form the Basis of an Arguable Reason for State Farm's Denial

Again, to succeed on a "normal" bad faith claim, Mrs. Border must show that at time of denial, there was no arguable or legitimate reason for State Farm to deny the claim. *Brechbill*, 144 So. 3d at 257. Plainly stated, bad faith means, "'No lawful basis' . . . mean[ing] that the insurer lacks a legitimate or arguable reason for failing to pay the claim. That is, when the claim is not fairly debatable, refusal to pay will be bad faith.… When a claim is 'fairly debatable,' the insurer is entitled to debate it, whether the debate concerns a matter of fact or law." *Slade*, 747 So. 2d at 303 (quoting *Gulf Atl. Life Ins. Co. v. Barnes*, 405 So. 2d 916, 924 (Ala. 1981)). "Bad faith, then, is not simply bad judgment or negligence. It imports a dishonest purpose and means a breach of known duty, i.e., good faith and fair dealing, through some motive of self-interest or ill will." *Id.* at 303–04 (quoting *Barnes*, 405 So. 2d at 924); *accord Brechbill*, 144 So. 3d at 259–60. "[T]he plaintiff must show that the insurance company had no legal or factual defense to the insurance claim." *Slade*, 747 So. 2d at 304 (quoting *Nat'l Sec. Fire & Cas. Co. v. Bowen*, 417 So. 2d 179, 183 (Ala. 1982)); *Cobblestone*, 377 F. Supp. 3d at 1306.

In this case, there was no legitimately arguable reason for State Farm's denial. It is undisputed that Mrs. Border complied with the terms of the Policy dictating her duties in the event of a loss, and that coverage was never an issue. The facts of this case closely mirror the facts in *Coleman v. State Farm Fire & Cas. Ins. Co.*, 808 F.Supp.3d 1401 (M.D. Ga. 2025). In *Coleman*, the plaintiffs' home was destroyed in a fire. After the fire, the plaintiffs hired a third-party contractor to make repairs to their home. The contractor submitted an initial lump sum estimate of $256,000 to do the repairs. *Id.* at 1404. Several weeks later State Farm responded to plaintiff asking that the contractor submit a "break down" of the estimate. *Id.* State Farm then performed an Xactimate estimate of $102,155.77. *Id.* at 1405. Plaintiffs' contractor wrote a letter providing

more detail to his estimate, but several months later, State Farm requested "yet another letter … requesting a more detailed estimate from Plaintiffs' contractor." *Id.* The contractor informed State Farm that he could not do the repairs for the amount of Xactimate estimate, and although State Farm never formally denied the claim, it never took steps to reach a resolution. Two years after the fire, the plaintiffs' home was unhabitable as repairs had not begun. *Id.*

The Court denied State Farm's motion for summary judgment as to the bad faith claim. State Farm argued that it paid the ACV as determined by Xactimate, which State Farm argued "was its only obligation to pay because Plaintiffs never provided an alternative [ACV]." *Id.* at 1408. The Court first addressing the denial (or lack thereof), holding that although there was no denial in any letter, there were "omissions, delays, and evasions," noting that bad faith is "rarely established by anything other than inference." *Id.* at 1409. The Court also denied State Farm's motion as to the bad faith claim, holding:

> It appears by inference that [the adjuster] was guided more by a wooden adherence to State Farm's computer programs with their standards and requirements than any consideration to actual evidence of loss. Through omission and perhaps perceived misdirection, a pattern of delay can certainly be inferred from State Farm's conduct. Added thereto are State Farm's failures to pay for … loss of use expenses. In short, while State Farm may have its reasons for not paying what is owed under the Policy, these reasons may be overcome by inferences of bad faith that arguably arise from its course of dealings with Plaintiffs.

*Id.* (some alteration added).

In *State Farm Fire & Casualty Co. v. Slade*, 747 So.2d 293 (Ala. 1999) the plaintiffs' residence was severely damaged as a result of soil shifting, which was caused by lightning striking and destroying a retaining wall. The plaintiffs' homeowners' insurance policy generally covered damage caused by lightning, but it did not cover damage resulting from "earth movement." Based on that exclusionary provision in the policy, State Farm refused to pay the claim, and the plaintiffs sued, alleging breach of contract and bad-faith refusal to pay an insurance claim.

The Alabama Supreme Court held that the plaintiffs had presented sufficient evidence in support of their contention that the insurance company failed to investigate their claim properly, and therefore, State Farm was not entitled to a judgment as a matter of law on the plaintiffs' bad-faith claim. Specifically, the Court found that the plaintiff presented evidence, inter alia, that State Farm: (1) never, in the course of its investigation, sent someone who was *qualified* to conduct a lightning investigation; (2) never interviewed any witnesses present on the day of the lightning strike; (3) never investigated lightning as a cause; (4) instructed its engineer to investigate a soil problem and never told him about the lightning strike; and (5) that State Farm's actions conflicted with its "Good Faith Claims Handling Video." *Id.* at 315.

On appeal, the Court held that this evidence created a fact question as to whether State Farm properly investigated the claim, and the trial court properly submitted the bad faith claim to the jury. *Id.*

In this case, an unqualified adjuster prepared two estimates for purposes not allowed by the Policy, designated a scope of repairs that could not be ascertained after being advised that of that fact by State Farm's agent and the only individual qualified to establish scope of repairs. Upon preparing and relying on the October 2024 estimate, State Farm ignored its agent's estimate and delayed the claim process for three months before basing a second payment on an estimate prohibited to be used by the Policy in the manner it was, and with scope still inadequately determined. In short, there was no arguable or legitimate basis for State Farm to deny the claim, and as a result, Mrs. Border's claim for "normal" bad faith survives.

### C. State Farm's Use of the Xactimate Estimate to Deny the Claim Constitutes "Abnormal" Bad Faith.

"An insured can succeed in an 'abnormal' bad-faith claim by showing (1) an intentional or reckless failure to investigate a claim, (2) intentional or reckless failure to properly subject a claim

to a cognitive evaluation or review, (3) the manufacture of a debatable reason to deny a claim, or (4) reliance on an ambiguous portion of a policy as a lawful basis for denying a claim. *Norman*, 2023 WL 5020253, at *8 (citing *White*, 953 So. 2d at 349).

"While '[t]he existence of a debatable reason for denying the claim at the time the claim was denied defeats a bad faith failure to pay the claim,' *Brechbill*, 144 So. 3d at 259 (emphasis omitted), '[t]he absence of a debatable reason not to pay a claim cannot be grounded on the vagaries of construction of an ambiguity.'" *Norman*, 2023 WL 5020253, at *8 (quoting *Emps. Benefit Ass'n v. Grissett*, 732 So. 2d 968, 977 (Ala. 1998) (internal to *Brechbill* in *Norman*). "Otherwise, 'if an insurer's subjective interpretation of an insurance policy could create the fairly debatable reason needed to defend a bad faith claim, then insurers would be encouraged to write ambiguous insurance policies.' *Norman*, 2023 WL 5020253, at *8 (quoting *Blackburn v. Fidelity & Deposit Co. of Maryland*, 667 So. 2d 661, 669 (Ala. 1995)).

In an "abnormal" bad faith claim, "[t]he relevant question before the trier of fact would be whether a claim was properly investigated and whether the results of the investigation were subjected to a cognitive evaluation and review." *Slade*, 747 So. 2d at 304. "Implicit in that test is the conclusion that the knowledge or reckless disregard of the lack of a legitimate or reasonable basis may be inferred and imputed to an insurance company when there is a reckless indifference to facts or to proof submitted by the insured." *Id.*

In *Norman*, the sheetrock in plaintiffs' home began to crack, so they hired a third-party to repair the damage. *Id.* at *2. Plaintiffs then purchased a homeowner's policy with supplemental sinkhole collapse coverage. *Id.* Several years later, plaintiffs began suffering additional sheetrock cracking. *Id.* State Farm's geologist determined that the cracking was due to an issue that was not properly repaired by the third-party hired by plaintiffs, so State Farm denied the claim. *Id.* at *3

Following State Farms' denial, the plaintiffs hired an engineer to inspect the home. *Id.* The engineer opined that the cracking was caused by movement in the foundation resulting from the consolidation of loose or weakly compacted soils beneath the foundation; however, he did not opine that a sinkhole caused the damage but did observe at least one sinkhole on the property. *Id.* State Farm denied the claim for a second time.

Thereafter, a consultant examined the plaintiffs' property and opined that the damage to the plaintiffs' home was due to differential settlement that occurred as "a direct result of ground subsidence resulting from the sinkhole activity beneath or in close proximity to the [plaintiffs']." *Id.* at *4. State Farm then issued its final denial of the claim.

This Court denied State Farm's motion for summary judgment on the breach of contract claim holding that ambiguous language included in the policy must be read in the light most favorable to the insured. Specifically, the Court noted that "'[u]nder Alabama law, when doubt exists as to whether coverage under an insurance policy is provided, language used by the insurer must be construed for the benefit of the insured.'" *Id.* at *5 (quoting *Assoc. Scrap Metal, Inc.*, 927 F. Supp. at 437). This Court reasoned that the term "sudden" was ambiguous and is reasonably susceptible to several different meanings. Additionally, the court noted that a reasonable juror reading the word "sudden" using its non-temporal meaning could conclude that the settlement of the plaintiffs' home was actually "unexpected." In addition, the Court held that the words "similar rock formations" as used in the policy were also ambiguous, and the policy failed to provide any parameters for determining whether a rock form was similar to limestone. This Court reasoned that State Farm, as the policy drafted, could as the policy drafter, the defendant could have easily provided some form of guidance as to the issue, but its failure to provide such guidance created an ambiguity that requires reading in favor of the insured. *Id.* at *6.

The Court granted State Farm's motion as to "normal" bad faith; however, it denied the motion as to the "abnormal" theory. The Court opined that State Farm's denial of the claim based on ambiguous terms in the policy cannot form a legitimate, arguable, or debatable reason for the denial. *Id.* at *9 (citing *Garber v. Nationwide Mut. Ins. Co.*, 2021 WL 5811733, at *11 (N.D. Ala. 2021) ("[A]n insurer's interpretation of an ambiguous term in an insurance policy cannot serve as a reasonably legitimate, arguable, or debatable reason for a claim denial, at least for abnormal bad faith claims."); *Wilson v. Cent. United Life Ins. Co.*, 2011 WL 13285996, at *11 (N.D. Ala. Aug. 19, 2011) (denying summary judgment on an abnormal bad faith claim because the insurer relied on ambiguous provisions that were not construed favorably to the insured to deny policy coverage)). This Court also held that there was a genuine fact that precluded summary judgment for the defendant because there was a dispute over when the reopened claim was actually denied and whether State Farm acted recklessly in failing to investigate the claim. *Id.*

Here, there is a factual dispute as to whether State Farm properly investigated Mrs. Border's claims. And there is also a fact question as to whether State Farm manufactured a reason not to pay the claim by virtue of the improper Xactimate estimates and whether it relied on ambiguous provisions (i.e., "detailed" estimate) as a lawful basis for denying the dwelling claim. *See also Johnston v. Allstate Ins. Co.*, 2008 WL 11425726, at *5 (S.D. Ala. 2008) (denying the insurer's motion for summary judgment on the "abnormal" bad faith claim involving a dispute over the plaintiffs' contractor's alleged failure to provide a detailed estimate and holding that a factual dispute existed as to the cost of repairs and whether the insurer's failure to investigate further was intentional or reckless.) Mrs. Border's claim for bad faith of the "abnormal" variety concerning the claim under Coverage A should proceed to trial, and State Farm's Motion as to this issue is due to be denied.

## IV. **<u>State Farm Committed "Normal" and "Abnormal" Bad Faith concerning Mrs. Border's Benefits under "Coverage C – Loss of Use</u>."**

There is no arguable reason for State Farm's failure to pay Loss of Use/ALE benefits. In fact, there is no reason at all. It is undisputed that Mrs. Border was entitled to the benefits, and it is also undisputed that the Policy does not place the conditions for payment that State Farm required. The Policy does not require the work to be ongoing. The reason was concocted by State Farm to avoid paying the benefits. If that does not rise to the level of bad faith, one cannot imagine what possibly would.

Once again, *Cole* is enlightening. In that case (similar to State Farm here), the carrier argued that it owed no further ALE expenses because it paid four months of living expenses and repairs would have only taken four months to complete. 326 F.Supp.3d at 1326. The Court rejected this argument, holding

> Reading the Policy in the light most favorable to the insured, the provision does not, as Owners claims, permit Owners to, first, unilaterally determine an estimated minimum-time-to-repair and, second, only pay additional living expenses for the estimation it conjures. **<u>If the court read the provision to permit Owners to act in this way, Owners would be able to cut off homeowners from payments to force them to accept its viewpoint on the value of an underlying dwelling-loss claim</u>**.

*Id.* (emphasis added).

That is exactly what State Farm did here. It attempted to leverage loss of use benefits to force-feed its woefully deficient of ACV benefits under Coverage A. In other words, State Farm cut off ALE to force Mrs. Border to accept its viewpoint on the value of the underlying dwelling loss claim. This is textbook bad faith. And it is also "abnormal" bad faith. The unilateral cessation of the benefits was the product of State Farm's intentional failure to investigate the dwelling or the ALE claims. Further, the denial was the result of either a manufactured reason not to pay (i.e., repairs must be ongoing) or reliance on an ambiguous provision of the Policy (i.e., "detailed

estimate" required to pay the ACV dwelling claim, thereby resulting in ongoing repairs. Under either theory, Mrs. Border has presented substantial evidence that State Farm engaged in "normal" and "abnormal" bad faith as it relates to Mrs. Border's claims for Loss of Use/ALE benefits. These claims should be presented to a jury.

## CONCLUSION

For the foregoing reasons, State Farm's Motion for Summary Judgment (Doc. 45) is due to be denied in its entirety.

Respectfully submitted this the 21st day of October 2026.

*/s/ Davis B. Whittelsey*
One of the Attorneys for Plaintiff
Donna Border

**OF COUNSEL:**
Davis B. Whittelsey
Jonathan K. Corley
WHITTELSEY & CORLEY, LLC
Post Office Box 106
Opelika, Alabama 36803–0106
(334) 745–7766
dwhittelsey@wwp-law.com
jcorley@wwp-law.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this the 21st day of October 2026, I filed the foregoing using the CM/ECF system, which will send notification via email to the following counsel of record:

Micheal S. Jackson
WEBSTER, HENRY, BRADWELL,
COHAN, SPEAGLE & DESHAZO, P.C.
Post Office Box 239
Montgomery, Alabama 36101-0239
mjackson@websterhenry.com

*<u>/s/ Davis B. Whittelsey</u>*
Davis B. Whittelsey